**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**


**CHRISTIE DOUCETT,**

>           **Plaintiff,**

**vs.**                                                          **Civ. No.  08-826 JCH/LFG**

**D.R. HORTON, INC.,**
**a Delaware Corporation,**

>           **Defendant.**


## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendant D.R. Horton, Inc.'s ("Horton") *Motion for Summary Judgment No. 1* [Doc. 51], and *Motion for Summary Judgment No. 2* [Doc. 52], both filed June 15, 2009.  Plaintiff Christie Doucett worked for Horton until June 2007, at which point Horton laid off numerous employees, including Plaintiff.  Plaintiff, who was pregnant at the time of her layoff, contends that she was terminated from her job because of her pregnancy and because she attempted to exercise her rights under the Family and Medical Leave Act.

The Court having considered the motions, briefs, attachments, and relevant law, and being otherwise fully informed, finds that Horton's first motion, addressing liability, is well taken and should be GRANTED.  Because the Court grants Defendant summary judgment on the issue of liability, it finds Horton's second motion for summary judgment, addressing damages, to be moot.

## BACKGROUND

Defendant Horton is one of the largest residential homebuilders in America, with

operations in numerous states, including New Mexico.[1]  During the time period relevant to this case, Horton's New Mexico division contained a Design Center in which Horton employees classified as "design center coordinators" showed potential homebuyers options such as carpeting, tile, cabinets, fixtures, and countertops and discussed upgrades from the standard housing options.  Plaintiff began working for Horton as a design center coordinator in May 2005, with her main duty being to help homebuyers select options and upgrades after they had committed to having Horton build a house for them.

Late in 2006, Plaintiff became pregnant with her first child.  She subsequently applied for Family and Medical Leave Act ("FMLA") leave, and was granted that leave in February 2007.  Plaintiff initially scheduled to begin taking her leave after she delivered her child, which was due in late June 2007.  However, in May 2007, Plaintiff began having some complications with her pregnancy and in early June she asked her supervisor and Horton's New Mexico Human Resources Manager if she could reduce her hours or begin leave early.  Before Plaintiff heard back from Horton about whether she could begin her leave early, she was laid off, along with 23 other employees, on June 12, 2007.  Plaintiff contends that she was laid off because she was pregnant, in violation of the Pregnancy Discrimination Act, 42 U.S.C. §§ 2000e(K) *et seq*. ("PDA"), and because she attempted to exercise her rights under the FMLA, 29 U.S.C. §§ 2601 *et seq.*, in violation of the FMLA's anti-retaliation provisions.

To put Plaintiff's contentions into context, one must consider the state of the U.S.

---

[1] The facts for this background section are taken from the list of Defendant's Undisputed Material Facts to which Plaintiff admitted, Plaintiff's Statement of Facts for which Plaintiff provided evidence, and the portions of Defendant's Undisputed Material Facts for which Plaintiff did not offer evidence to the contrary.  In places where the facts are contested, the Court notes this and draws all reasonable inferences in favor of Plaintiff as the nonmoving party.  *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

residential real estate market, and Horton's position in it, in the time leading up to and following Plaintiff's June 2007 layoff.  In the first five or six years of the past decade, home sales all over the United States increased rapidly, and most of Horton's divisions increased their hiring accordingly.  However, by 2007, the economy in general and housing sector in particular was slowing, and Horton therefore began decreasing its number of employees.  At its peak in 2005 or 2006, Horton employed approximately 10,000 employees nationwide.  By June 2009, it had reduced its workforce by over 70 percent, employing only 2,800 people.  Horton's New Mexico division followed a similar trend.  Mark Ferguson, the President of Horton's New Mexico division at the time of Plaintiff's layoff, started up Horton's New Mexico division in 1996.  By 1998, it had 20 employees.  The New Mexico division continued to grow rapidly over the next few years as the housing market picked up substantially, and, by 2006, it had approximately 140 employees.  In 2007, with the slowdown of the economy, Horton's sales were in a steep decline with projections of even further declines.  In Horton's fiscal years 2005 and 2006, the total sales for its New Mexico division were 1339 and 1515 homes respectively.[2]  By fiscal years 2007 and 2008, its total sales had declined to 842 and 542 respectively, reflecting a decrease of almost 65 percent between 2006 and 2008.

Because a home purchase usually does not close until several months after a purchase agreement is signed, a backlog of closings would represent market activity several months prior, and current revenue thus reflects past sales rather than current sales.  Thus, although Horton's New Mexico division was considered on budget at the time of the first layoff in June 2007, in that it was meeting its obligations and bringing in anticipated revenue, management's concern

---

[2] Horton's fiscal years begin October 1, so, for instance, its 2005 fiscal year ran from October 1, 2004 through September 30, 2005.

was with current and projected sales rather than with current revenue because of the lag time.  In

fact, as early as mid-2006, Mr. Ferguson received an email from Horton's Southwest Region

President counseling divisions to keep their expenses down because he could see the downtrend

in markets across the United States, and another email from Horton's President and CEO stating

that the enclosed suggested ways to cut costs immediately are just "scratching the surface on

what is coming.  You might as well be proactive and start cutting everything that moves now,

because the corporate focus...will be to drive down every cost and eliminate as many as

possible." *See* Exs. C and D, attached to Affidavit of Mark Ferguson (hereinafter "Ferguson

Affidavit") [Doc. 53].

  In this climate, Horton announced its first general layoff of New Mexico employees, in

which Plaintiff was included, on June 12, 2007.  The June layoff included 24 employees.

Horton's New Mexico division instituted a second layoff on September 17, 2007, resulting in 12

terminations, and instituted a third round of layoffs on January 7, 2008, which resulted in the

loss of 15 more New Mexico jobs.  In all, Horton laid off 51 employees in less than seven

months.

  At the time of Plaintiff's layoff, Horton employed three design center coordinators in its

New Mexico Design Center: Plaintiff, Leslie Sauer, and Marina Giannini.  In addition to the

three design center coordinators, the Design Center was staffed by a receptionist, Toni Jensen,

and managed by Melissa Ipiotis.  Of the three design center coordinators, Plaintiff had the most

seniority, having been hired almost seven months before Ms. Giannini and approximately ten

months prior to Ms. Sauer.  Each of the design center coordinators made a salary plus

commissions on their sales of house upgrades and options.  The amounts of their commissions

varied from one another, depending on which homebuyer met with which design center

coordinator and which options the homebuyer selected.  Although each design center

worked for commissions as well as salary, they each had different backgrounds and,

consequently, played different roles within the Design Center.  For instance, Ms. Sauer had

worked as an interior decorator for other builders for over ten years prior to being hired by

Horton and, as such, was specifically hired to assist in the interior design and staging of Horton's

model homes as well as to serve as a design coordinator for buyers.[3]  In addition to staging the

model homes, Ms. Sauer was chosen to sell options to customers at one of Horton's more

upscale subdivisions because her manager believed that Ms. Sauer's extensive design experience

would assist her in dealing with the more demanding buyers at that subdivision.  Ms. Giannini

had also trained in interior decorating prior to being hired by Horton, and had received her

diploma in interior decorating from the Professional Career Institute.  In contrast, Plaintiff had

no training or experience as a design or decor coordinator prior to being hired by Horton, but she

did have some background in customer service and sales.

After the June 2007 general layoff, Ms. Ipiotis and the remaining Design Center

employees were transferred to other departments.  Shortly thereafter, in an effort to further save

costs, Horton closed down its Design Center and transferred its functions to an outside company

not affiliated with Horton: Creative Touch Interiors ("CTI").  Horton and CTI signed a contract

on August 20, 2007, and, thereafter, CTI employees staffed and ran the Design Center.  In

September 2007, Horton included Ms. Giannini in its second general layoff.  However, Ms.

---

[3] Plaintiff denies Horton's contention that Ms. Sauer was hired in part to work on staging its model homes but, as with many of her other denials, fails to come forward with any evidence to the contrary.  Instead, she merely states that Ms. Sauer and Ms. Giannini must have had the same duties as Plaintiff because all three of them had the same title.  *See* Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment No. 1  [Doc. 70] at 18.

Giannini secured a job with CTI that she began two days after her layoff from Horton.  In January 2008, Ms. Jensen, who had been the Design Center's receptionist, was laid off as part of Horton's third general layoff.

## **LEGAL STANDARD**

A.  <u>Summary Judgment Generally</u>

Summary Judgment is appropriate if "the record contains no evidence of a genuine issue of material fact and demonstrates that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 247 (1986); *Woodman v. Runyon*, 132 F.3d 1330, 1337 (10th Cir. 1997); Fed. R. Civ. P. 56(c).  The Court views the record and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. *Thomas v. Int'l Bus. Machs.*, 48 F.3d 478, 484 (10th Cir. 1995).  The moving party has the initial burden of showing that there is no genuine issue of material fact.  *Anderson*, 477 U.S. at 256. Once the moving party has met its burden, the non-moving party must do more than merely show that there is some doubt as to the material facts.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party may not rest on the mere allegations or denials of the pleadings, but must set forth specific facts showing a genuine issue for trial.  *Anderson*, 477 U.S. at 248, 256.  Although the Court views the evidence and draws all inferences in the light most favorable to the party opposing summary judgment, that party still "must identify sufficient evidence which would require submission of the case to a jury."  *Mares v. ConAgra Poultry Co.*, 971 F.2d 492, 494 (10th Cir. 1992).  Unsupported allegations, conclusory in nature, are insufficient to defeat a proper motion for summary judgment. *Anderson*, 477 U.S. at 248.  Fatally for Plaintiff's claim, "[s]peculation or hunches admidst rumor and innuendo will not suffice." *Maestas v. Segura*, 416 F.3d 1182, 1189 (10th Cir. 2005).

B.  <u>Summary Judgment on Claims under the PDA or FMLA</u>

The PDA amended Title VII to prohibit an employer from discriminating "against any individual with respect to...compensation, terms, conditions, or privileges of employment,...because of or on the basis of pregnancy, childbirth, or related medical conditions."  42 U.S.C. §§ 2000e-2(a)(1), 2000e(k).  Courts analyze claims brought under the PDA the same way they analyze other discrimination claims brought under Title VII.  *See EEOC v. Horizon/CMS Healthcare Corp*., 220 F.3d 1184, 1191 (10th Cir. 2000); *EEOC v. Ackerman, Hood & McQueen, Inc.*, 956 F.2d 944, 947 (10th Cir. 1992).  Similarly, they analyze claims of FMLA retaliation the same way as other discrimination claims brought under Title VII.  *See Morgan v. Hilti*, 108 F.3d 1319, 1323 (10th Cir. 1997).  To prevail on these types of claims, a plaintiff must show, through direct or indirect evidence, that the employment action complained of was based on intentional discrimination.  *See Horizon*, 220 F.3d at 1191.

A plaintiff who lacks direct evidence of intentional discrimination may use the burden-shifting framework first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).  *See id*.  Under the *McDonnell Douglas* methodology, a plaintiff bears the initial burden of establishing a *prima facie* case of discrimination by a preponderance of the evidence.  *See id*.  If a plaintiff meets her burden of establishing a *prima facie* case of discrimination, the burden then shifts to the defendant to "articulate a legitimate, nondiscriminatory reason for the adverse employment action suffered by the plaintiff."  *Id*.  The defendant's burden at this second stage is one of production rather than persuasion.  *See id*. (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981)).  If the defendant is able to articulate a facially nondiscriminatory reason for its adverse employment action, "the plaintiff can avoid summary judgment only if she can show that her '[protected status or activity] was a determinative factor

7

in the defendant's employment decision, or show [that] the defendant's explanation for its action was merely pretext.'" *Horizon*, 220 F.3d at 1191 (quoting *Atchley v. Nordam Group, Inc.*, 180 F.3d 1143, 1148-49 (10th Cir. 1999)).  Even though, under the *McDonnell Douglas* framework, the burden of production shifts from plaintiff to defendant and back to plaintiff, a plaintiff bears the ultimate burden of proving intentional discrimination.  *Id*. at 1191-92 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993)).

## DISCUSSION

A. Plaintiff's PDA Claim

    1.  Plaintiff's *Prima Facie* Case

In order to establish a *prima facie* case of discrimination under the PDA, the plaintiff in a reduction in force ("RIF") case such as this must demonstrate that: (1) she is within the protected group; (2) she performed satisfactory work; (3) the defendant discharged her despite the adequacy of her work; and (4) the record contains some evidence that the employer intended to discriminate against the plaintiff in reaching its RIF decision.  *See Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1137 (10th Cir. 2000).  This fourth element can be met by demonstrating that the employer could have retained the plaintiff, but chose instead to retain a non-protected employee.  *See Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1167-68 (10th Cir. 1998).  At this stage, the plaintiff need not show that she was as qualified or more qualified than the retained employees; only that she was performing satisfactory work and that non-protected employees were retained.  *See id*. at 1168 n.5.

Plaintiff has met her burden to establish a *prima facie* case of pregnancy discrimination.  It is undisputed that she was pregnant at the time she was laid off, thus meeting the first element.  Plaintiff has also presented evidence to demonstrate that her job performance was satisfactory.

Her immediate supervisor testified that Plaintiff "wasn't incapable of doing anything.  She was a good employee.  She was a good employee capable of doing the task that she was given, and so were the others." Deposition of Melissa Ipiotis, attached as Ex. 4 to Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment No. 1 (hereinafter "Pl. Resp.") [Doc. 70] at 67.   Plaintiff was terminated despite this satisfactory performance, thus demonstrating the third factor.  Finally, at least for a time after Plaintiff's June 2007 layoff, Horton retained the two other design center coordinators that were not pregnant, Ms. Sauer and Ms. Giannini, thus enabling Plaintiff to demonstrate the forth factor and to make her *prima facie* case.

2.   Defendant's Proffered Reasons for Plaintiff's Layoff

Because Plaintiff has made her *prima facie* case, the burden falls to Defendant to demonstrate that it had a legitimate, non-discriminatory reason for Plaintiff's layoff.  *See McDonnell Douglas*, 411 U.S. at 802.  Defendant easily meets this burden.  Defendant has amply demonstrated that economic conditions required it to cut its staff significantly, including staff in its Design Center.  With respect to the decision to select Plaintiff for layoff rather than her co-workers, Defendant contends that the New Mexico Division President made the decision to eliminate Plaintiff's position based on input from the Design Center Supervisor regarding which of the design center coordinators appeared be the least helpful in moving the company forward based on a combination of skills, inter-personal relations, performance, initiative, and similar considerations.  Thus, Defendant has articulated a facially non-discriminatory reason for Plaintiff's layoff, and has therefore met its burden under the second step of the *McDonnell Douglas* framework.

3.   Plaintiff's Evidence of Pretext

Once a defendant meets its burden of articulating a facially non-discriminatory reason for

a termination, "the presumption of discrimination created by the plaintiff's *prima facie* case

'simply drops out of the picture.'" *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160,

1167 (10th Cir. 2007) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)).  At

this point, a "plaintiff then carries the full burden of persuasion to show that the defendant

discriminated on the illegal basis of" pregnancy.  *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114,

1125 (10th Cir. 2005).  To do this, Plaintiff must show that a reasonable trier of fact might find

pregnancy to have been a determining factor in the employment decision, thus demonstrating

that Defendant's articulated reasons for her layoff are pretextual in nature.  *See Plotke v. White,*

405 F.3d 1092, 1099 (10th Cir. 2005).  "Pretext can be shown by such weaknesses,

implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered

legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy

of credence and hence infer that the employer did not act for the asserted non-discriminatory

reasons." *Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir. 1997).[4]  Title VII "is not a

vehicle for reviewing the propriety of business decisions," *Furr v. Seagate Tech., Inc.*, 82 F.3d

980, 986 (10th Cir. 1996), and the Court "will not second guess business decisions made by

employers, in the absence of some evidence of impermissible motives."  *Lucas v. Dover Corp.*,

857 F.2d 1397, 1403-04 (10th Cir. 1988).  The relevant inquiry here is not whether Defendant's

---

[4] Defendant contends that Plaintiff must not only offer evidence sufficient to demonstrate that Defendant's proffered reasons for the layoff were pretextual, but that Plaintiff must also provide evidence of intentional discrimination.  *See* Def't. Mot. [Doc. 51] at 27.  However, the Tenth Circuit has "definitively rejected a 'pretext plus' standard; in order to survive summary judgment, a plaintiff generally need not provide affirmative evidence of discrimination beyond the *prima facie* case and evidence that the employer's proffered explanation is pretextual." *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1168 (10th Cir. 2007).  Thus, the Court grants summary judgment for Defendant because it finds that Plaintiff has not come forward with sufficient evidence to allow a reasonable trier of fact to find pretext, not because Plaintiff has also failed to come forward with evidence of intentional discrimination.

actions were wise, fair, or correct, but whether Defendant honestly believed those reasons and acted in good faith on those beliefs. *See Riggs v. Airtran Airways, Inc.*, 497 F.3d. 1108, 1118-19 (10th Cir. 2007).

Plaintiff does not really attempt to challenge Horton's need to undertake a significant reduction in force in the face of the worst residential real estate market in a generation. After all, Plaintiff's layoff occurred alongside the layoff of 23 other employees in June 2007, and 27 other employees over the next seven months, resulting in a total RIF of over 35 percent of Horton's employees. Instead, Plaintiff asserts that one of her co-workers should have been laid off instead of her, and that she was chosen for layoff because of her pregnancy. Plaintiff offers several examples of alleged inconsistencies in Horton's statements regarding her layoff that she contends raise sufficient questions such that a reasonable factfinder could find the statements unworthy of credence. Although Plaintiff's arguments regarding inconsistencies are not particularly straightforward, the Court does its best to discern the substance of Plaintiff's claims. The Court examines each of these alleged inconsistencies in turn.

1. The timing of the layoff decision

In contending that Defendant has changed over time its explanation for when it decided to lay her off, Plaintiff first points to Defendant's position statement that it submitted in response to Plaintiff's EEOC complaint in this matter. In its EEOC response, Defendant indicates that, even before anyone learned of Plaintiff's pregnancy, Plaintiff's direct supervisor, Ms. Ipiotis, ranked Plaintiff as the first person in the Design Center that she would recommend for termination in the event that layoffs became necessary. *See* EEOC statement, attached as Ex. 8 to Pl. Resp. [Doc. 70] at 2-3. The response indicates that Ms. Ipiotis had been asked well in advance of the June 2007 layoff to consider which employees would be most critical to retain in

11

the event of a RIF, and that she ranked Plaintiff as the weakest of the three design center coordinators.  Plaintiff attempts to contrast the EEOC response with a statement in Ms. Ipiotis's deposition in which she testified that she did not learn that there may be a layoff until May 30, 2007, and that it was not until May 30, 2007 that Mr. Ferguson told Ms. Ipiotis and other managers to start thinking about who they might recommend for layoff in case of a RIF.  *See* Pl. Resp. at 5, 29.  Further, Plaintiff alleges an inconsistency between Mr. Ferguson's testimony that, after May 30, 2007, Ms. Ipiotis told him that if she had to lose an employee, she would recommend that it be Plaintiff, and Ms. Ipiotis's testimony that she could not recall when or to whom she communicated any ranking of her employees after becoming aware of the possibility of layoffs.  *See id.* at 5-6.  Finally, Plaintiff contends that Ms. Ipiotis's testimony that, when she was called into the meeting at which Plaintiff was informed of her layoff, Ms. Ipiotis did not know who was to be terminated that day or how many would be terminated indicates that she had not provided her ranking of design center coordinators to Mr. Ferguson.

As a preliminary matter, it is not clear that a statement made in an EEOC position statement, which was not sworn to, verified by, or signed by any employee of Defendant, could serve as the basis for a finding of material inconsistency for purposes of demonstrating pretext. Even assuming that the EEOC statement could serve such a purpose, however, the Court finds no inconsistencies between the timing referred to in the EEOC statement and that testified to by Defendant.

Consistent with the EEOC statement, deposition testimony suggests that Ms. Ipiotis informally ranked her employees well before May 30, 2007.  According to the EEOC statement, deposition testimony, and affidavits, Ms. Ipiotis and Kathy Rhoades (Ms. Ipiotis's supervisor until a short time before the June 2007 layoff) routinely discussed staff skills and staffing levels,

and Ms. Rhoades asked Ms. Ipiotis on several occasions to rank her employees in terms of who was most critical to the company's success.  *See* Affidavit of Melissa Ipiotis (hereinafter "Ipiotis Affidavit") [Doc. 54] at ¶ 17, Deposition of Melissa Ipiotis, attached as Ex. 4 to Pl. Resp. [Doc. 70] (hereinafter "Ipiotis depo.") at 52, 58-61.

The stated facts that Ms. Ipiotis did not learn until shortly before the layoff that layoffs were forthcoming, and that she was not asked by Mr. Ferguson to begin thinking about who she would recommend for a layoff in the event it was necessary, are consistent with her sworn statements that she had been informally ranking her employees for some time.  Although Mr. Ferguson did not tell Ms. Ipiotis that layoffs were imminent until May 30, 2007, the news certainly did not come as a surprise to her because of market changes and the fact that traffic to the Design Center had dropped significantly.  Ipiotis depo. at 49-50.  Thus, it makes perfect sense that she would be considering what to do in the event of a layoff even before formally asked to do so.  Similarly, the fact that, on June 12, 2007, Ms. Ipiotis did not know who would be terminated does not indicate that she had not provided her ranking to Mr. Ferguson.  Rather, it only strengthens Defendant's explanation because, if she did not know how many of her employees were to be terminated, it was even more important to have a ranking of all her employees in case more than one was to be terminated.  Finally, with reference to Plaintiff's assertions that Ms. Ipiotis did not know when or to whom she gave her ranking of employees after May 30, 2007, Ms. Ipiotis actually testified that, although she did not recall two years later exactly to whom she communicated her rankings, she believes that she communicated her rankings either to Mr. Ferguson directly or to Ms. Rhoades.  Plaintiff has failed to present any material inconsistencies regarding the timing of the decision to lay off Plaintiff.

2.  The reasons Plaintiff was selected over her co-workers for layoff

Plaintiff claims that Defendant has offered numerous contradictory explanations for why it chose to terminate Plaintiff rather than either of her co-workers.  She points to complimentary statements regarding Plaintiff's work that Ms. Ipiotis made in her deposition, and implies that these statements are inconsistent with the decision to select Plaintiff as the one to lay off for performance reasons.  For instance, Ms. Ipiotis said that, around the time of the June 2007 layoff, it was difficult for her to differentiate among the three design center coordinators because they were all good, Ipiotis depo. at 88, and that Plaintiff was a good employee capable of doing the tasks she was given.  *Id*. at 67.  Plaintiff also claims that Defendant's EEOC statement, an internal summary created just prior to the layoffs, and testimony regarding the reasons Defendant chose Plaintiff are inconsistent.

Ms. Ipiotis's compliments toward Plaintiff are not inconsistent with the rest of her testimony, nor do they demonstrate that Defendant's explanation for Plaintiff's layoff was pretextual.  Instead, they appear to be merely indicative of the difficulty of being forced to select an employee for termination when all employees are doing a good job.  Simply put, although Ms. Ipiotis liked Plaintiff and felt that she fit in well with the Design Center team, Ms. Ipiotis apparently did not believe that she was overall as strong of an employee as the other two design center coordinators.  *See* Ipiotis Affidavit at ¶ 15, Ipiotis depo. at 85-87.  Ms. Ipiotis clearly stated that, compared to Plaintiff's co-workers, she believed that Plaintiff had less confidence in dealing with challenging customers, was not quite as independent, and required more supervision.  *Id*.  In addition, while stating that there was not a large difference among the three design center coordinators, Ms. Ipiotis believed that Plaintiff did not have the same level of knowledge as her co-workers with respect to the products offered by Defendant and Defendant's systems and processes, and did not seem to retain information regarding such products and

14

systems as well as the others.  *Id.*   Likewise, in Ms. Ipiotis's opinion, Plaintiff did not participate

in department meetings as fully as her co-workers, and had a tendency to simply be present

rather than being fully engaged in providing constructive input in such meetings.  *See* Ipiotis

Affidavit at ¶ 16; May 2006 Performance Appraisal of Plaintiff, attached as Ex. Q to Ipiotis

Affidavit. [Doc. 54].[5]  Furthermore, Plaintiff's tendency not to seek out new assignments very

often, also noted in Plaintiff's May 2006 Performance Appraisal, led Ms. Ipiotis to believe that

Plaintiff was somewhat less interested in learning new skills or in taking on additional tasks than

her co-workers.  *Id.*

    Ms. Ipiotis's explanation in this litigation for why she ranked her three employees in the

order she did is thoroughly consistent with Defendant's EEOC statement and its internal

spreadsheet listing reasons for layoffs, and is consistent with her documented opinions going

back well before Plaintiff's pregnancy.  Defendant's EEOC statement notes Ms. Ipiotis's belief

that none of her employees were poor performers, but that Plaintiff was the weakest of the three

when comparing skills, initiative, and flexibility/adaptability.  *See* EEOC statement, attached as

Ex. 8 to Pl. Resp. [Doc. 70] at 2.  Consistent with later explanations given, the EEOC statement

lists as areas of concern Plaintiff's confidence, understanding of products and systems, ability to

retain information, willingness to learn new skills or take on new tasks, and comfort in dealing

with unhappy customers.  *Id.*

    Mr. Ferguson also prepared an internal spreadsheet in anticipation of the first round of

layoffs, listing all employees and briefly giving a summary explanation of the reasons to retain

_____

    [5] It is worth noting that Ms. Ipiotis completed Plaintiff's Performance Appraisal, which
indicated concerns about the depth of her product and systems knowledge, efficiency of
conducting appointments, lack of initiative, and lack of confidence with fellow employees and
customers, months before Plaintiff even became pregnant.

or to lay off an employee.  *See* Ex. 9 attached to Pl. Resp. [Doc. 70].  Next to Plaintiff's name,

the notation indicates "RIF/ Less productive member of the Dept. Difficulty multi-tasking."  *Id*.

at 2.  He testified that the reasons listed on the spreadsheet are not a full verbatim list as reported

to him by the managers working under him, but instead are simply notes so that he could have

bullet points in discussing anything that the corporate Human Resources ("HR") department

might want to talk about with regard to any particular employee.[6]  *See* Deposition of Mark

Ferguson, attached as Ex. A to Ferguson Affidavit [Doc. 53] (hereinafter "Ferguson depo.") at

39.  He based his summary on an oral report that he received from Ms. Ipiotis.  *See id*. at 51.

That a one-line summary on a spreadsheet does not list every reason later given to justify the

layoff hardly creates an inconsistency rising to the level of evidence of pretext.

     Plaintiff next attempts to argue that the spreadsheet's mention of her as a "less

productive" member of the department is implausible, because, in the year prior to her layoff,

Plaintiff earned higher commissions than her co-workers.  This argument fails for two reasons.

First, Defendant's Performance Appraisals use the term "productivity" to refer not to

commissions earned, but rather to whether "the employee produce[s] a significant volume of

work efficiently in a specified period of time."  Performance Appraisals, attached as Exs. Q and

R to Ipiotis Affidavit [Doc 54].  Plaintiff has offered no evidence that the spreadsheet's reference

to productivity has anything to do with commissions, rather than Defendant's typical use of the

---

[6] Although the corporate HR department plays no role in making the business decision of which employees to retain or to lay off, the managers making the layoff decisions provide information to the HR department on upcoming layoffs so that the department can look for patterns of treatment that would unlawfully burden women or protected minorities.  The corporate HR department has the ability to override a manager's decision to lay off an employee if it believes that the decision could violate the law.  *See* **Ferguson affidavit at ¶¶ 9, 10; Jones affidavit at ¶¶ 5, 6**.  Horton's HR department did not override any decisions to lay off any employee in any of the three rounds of layoffs.

term as defined in its Performance Appraisals.  On her Performance Appraisal, in the category of productivity, Plaintiff received a grade of "satisfactory," with the comment that she "is strong–she stays focused on given tasks, but speed needs to improve."  *See* Ex. Q.  Plaintiff's co-worker Melissa Giannini, on the other hand, received a grade of "good" in the productivity category, with the comment that she is "very productive–very efficient & is on top of pending issues."  *See* Ex. R.  Plaintiff has offered no evidence that these productivity issues changed between the time of the Performance Appraisals, issued before her pregnancy, and the time of her layoff.[7]  Second, Plaintiff has offered no evidence to counter Ms. Ipiotis's sworn statement that she did not take commissions into account when ranking her employees because each employee had no control over the number of homebuyers with whom they worked, their budgets, or their qualification limits, *see* Ipiotis Affidavit**.** at ¶ 13, so that commission levels are less relevant than concrete skills in judging employee value.  Further damaging to Plaintiff's argument is the fact that, from the start of 2007 through her layoff, Plaintiff was far behind Ms. Giannini in commissions earned, and only $300 ahead of Ms. Sauer, despite Ms. Sauer spending a significant amount of her time decorating model homes rather than selling options to homebuyers.  *See id*. at ¶ 14; 2007 Sales Commission Figures attached at Ex. S to Ipiotis Affidavit.  Thus, even if Plaintiff could somehow demonstrate that Mr. Ferguson's reference to "productivity" included commissions, she still cannot create an issue of pretext.

   3.  Failure to consider Plaintiff's seniority

---

[7] At the time Plaintiff and Ms. Giannini received their Performance Appraisals in May 2006, Ms. Sauer had not been with the company long enough to be included in the evaluation process.  *See* Ipiotis Affidavit at ¶ 17.  Ms. Ipiotis did not conduct any further formal appraisals of her employees prior to the June 2007 layoff, although she continued to informally appraise them.  *See id*.

Defendant hired Plaintiff in May 2005, Ms. Giannini at the end of November 2005, and Ms. Sauer in March 2006.  Thus, at the time of her layoff, Plaintiff had more seniority than either of her co-workers.  Plaintiff contends that Defendant's proffered reasons for her layoff are pretextual because it laid her off despite her seniority.  However, as with her other contentions, Plaintiff's argument regarding seniority fails to demonstrate any inconsistencies or weaknesses in Defendant's explanations such that a reasonable factfinder could find the explanations unworthy of credence.

Mr. Ferguson testified that Horton has no corporate policy requiring consideration of seniority or any other set criteria that managers must consider regarding layoffs.  *See* Ferguson Affidavit at ¶ 23; Ferguson Depo. at 70-71, 115; Defendant's Employee Personnel Policy Guidelines, attached as Ex. G to Ferguson Affidavit at 26.  His affidavit declares that he made no mention to managers that they should consider seniority when deciding whom to retain, but also that he did not tell them that they could not take it into consideration, if, in their belief, it was relevant in deciding who would be of the most assistance in moving the company forward.  *See* Ferguson Affidavit at ¶ 22.  In her testimony regarding criteria she took into consideration in deciding whom to retain, Ms. Ipiotis never mentioned seniority as a factor.  *See* Ipiotis depo. at 85-87, 97-99.

Rather than coming forward with evidence that Defendant's policies required it to consider seniority, Plaintiff points to the spreadsheet summarizing the reasons for layoffs that Mr. Ferguson provided to corporate HR to argue that Mr. Ferguson's testimony was untruthful.  *See* Pl. Resp. at 7-8, 31-32.  The spreadsheet summary listed as the reason for one of the 24 workers laid off in June 2007 "RIF/Newest on Staff," and for two other terminated workers "Less experince On the Job Time than retained staff."  *See* Ex. 9 attached to Pl. Resp. at 1, 3.

18

Regarding the two workers laid off because they had less experience than their co-workers, Mr. Ferguson testified that he believes that the reference in the spreadsheet to "experience on the job time" meant experience in the field in general, rather than time they had been working for Horton in particular.  *See* Ferguson depo. at 43-44.  However, even assuming that lack of seniority was the motivating factor for the layoff of all three of the employees in question, that still means that 21 of the 24 June layoffs were made without reference to seniority, meaning that Plaintiff was treated the same as 20 non-pregnant employees who were laid off.

The fact that an individual manager may have chosen to take seniority into consideration in recommending who to lay off is in no way inconsistent with Mr. Ferguson's testimony that neither he nor Horton's policies in general asked or required seniority to be taken into account, or with Ms. Ipiotis's testimony that seniority was not one of the factors she considered. Similarly, the fact that Defendant's corporate Human Resources Manager believes that seniority is an acceptable factor to take into consideration when choosing between employees who are truly equal does not contradict her testimony that Defendant has no corporate policy requiring managers to consider seniority or any other specific criteria in making layoff decisions.  *See* Affidavit of Vicki Lyn Jones [Doc. 55] (hereinafter *"*Jones Affidavit") at ¶ 7; Deposition of Vicki Lyn Jones, attached as Ex. T to Jones Affidavit (hereinafter "Jones depo.**")** at 28-29. Plaintiff has failed to provide any evidence that Defendant's failure to consider her seniority is inconsistent with its standard practices or indicative of discrimination in her case.

4.  Alleged pattern and practice of laying off pregnant workers

Plaintiff tries to impute to Defendant a pattern and practice of laying off pregnant employees.  In doing so, she cites the testimony of Sharian Stallworth, who worked for Defendant as a benefits coordinator and Human Resources coordinator until October 2007.  *See*

Pl. Resp. at 13, 39.  Plaintiff contends that Ms. Stallworth testified that, in the course of performing her job as a leave of absence coordinator, she became aware of other employees of Defendant who were laid off while pregnant.  In fact, Ms. Stallworth clarified her response to indicate that Plaintiff was not the only person on leave who was laid off, but that she did not recall whether anyone else who was pregnant was laid off.  *See* Deposition of Sharian Stallworth, attached as Ex. X to Deft. Mot. [Doc. 51] (hereinafter "Stallworth depo.") at 51-52.  Regardless, when agreeing that other employees had been laid off while on leave (but not necessarily pregnant), Ms. Stallworth was referring to the entire company, not solely the New Mexico division.  D.R. Horton reduced its workforce by over 7000 employees over a relatively short period of time, so even if Plaintiff had demonstrated that another employee was pregnant at the time of layoff, this would hardly rise to the level of pattern and practice.  Plaintiff has offered no evidence that pregnant women were over-represented in Horton's layoffs.  Plaintiff reverses the burden when she charges that "[Defendant] has adduced no evidence that any pregnant employee or any employee who had previously requested FMLA leave was *not* laid off in 2007 or 2008."  Pl. Resp. at 13.  In order to survive a motion for summary judgment, the burden is on the plaintiff to come forward with some admissible evidence to raise a question concerning whether a defendant had a pattern or practice of discrimination; it is not a defendant's burden to offer proof that it engaged in no such pattern.

     5.  Other alleged acts of discrimination

     Plaintiff also raises two incidents that she claims demonstrate that Defendant discriminated against her while she was pregnant, thus making it more likely that she was laid off because of her pregnancy.  First, she claims that Ms. Ipiotis refused Plaintiff's requests to help out in Horton's model homes or to assist in other departments, including telling Plaintiff

one time that she could not work in the model homes because she was pregnant.  Second,

Plaintiff alleges that Ms. Ipiotis demonstrated hostility toward her pregnancy by responding to a

question about where Plaintiff could pump breast milk when she returned from FMLA leave by

stating that she would need to do so in a bathroom stall.  Neither incident is sufficient to raise a

question of fact as to whether there is a direct link between this treatment and Plaintiff's

termination.

Plaintiff's only claim of being treated differently than her co-workers that directly

implicates her pregnancy arises from a single request, when she asked Ms. Ipiotis if she could

leave her post in the Design Center to go "help out" in the model homes one day.  *See*

Deposition of Christie Doucett, attached as Ex. 3 to Pl. Resp. (hereinafter "Doucett depo.") at 47.

Plaintiff does not recall how far along in her pregnancy she was that day, but she claims that Ms.

Ipiotis refused to let her leave because she was pregnant and Ms. Ipiotis did not want to be

responsible for her hurting herself or the baby.  *Id*.  Although Ms. Ipiotis explicitly denied that

Plaintiff's pregnancy played any role in her refusal to let her leave her position to go help

decorate the model homes, *see* Ipiotis depo. at 129-130, for purposes of this motion the Court

will presume that Plaintiff's contention is true and that Ms. Ipiotis expressed her concern about

Plaintiff's welfare in moving furniture while she was pregnant.  Even with this presumption,

however, Plaintiff still cannot show a link between this incident and her layoff.  Plaintiff admits

that helping to decorate and stage the models was not part of her job duties.  Doucett depo. at 47.

Plaintiff agrees that Ms. Sauer was already at the models that day, and that the job of decorating

and staging the models was generally handled by Ms. Sauer, who had ten years of experience

staging models prior to being hired by Defendant.  *Id*. at 49-50.  Plaintiff also admits that her

own concerns for her health would have precluded her from lifting anything heavy and that,

although she contends she could have done something else to help decorate the models, she does not know what was being done in the models that day, nor can she identify how she would have been able to help had she been allowed to go. *Id*. at 48-50. Citing an isolated incident unrelated to Plaintiff's actual job duties does not link Plaintiff's pregnancy to her layoff, even if her pregnancy was specifically mentioned as a reason to keep her at her post in the Design Center that day. *Cf. Riggs v. Airtran Airways, Inc.*, 497 F.3d 1108, 1118 (10th Cir. 2007) (evidence presented by 67 year-old plaintiff in age discrimination case that her supervisor told her that she was as old as the supervisor's mother, that the supervisor told her she was too old to be moving heavy luggage, and that the supervisor tried to assign her to a less physically demanding position was insufficient to survive summary judgment because the plaintiff failed to present any evidence tying this alleged discriminatory treatment to her termination).

Plaintiff also points to one other occasion that occurred "probably around the same time [she] was pregnant" when she asked if she could go try to help in Defendant's permitting department to work on "plat plans." Doucett depo. at 47-48, 51-52. Ms. Ipiotis denied her request, saying that she needed Plaintiff to stay in the Design Center to handle appointments, as she was the only design center coordinator there at the time. *Id*. at 47. Plaintiff has offered no evidence that Ms. Ipiotis related her decision to Plaintiff's pregnancy. Not only was working in another department not part of Plaintiff's job duties, but, in her deposition, Plaintiff admitted that she did not know the actual name of the department she wanted to visit, that she did not know much about what sort of work they did because she had no background in such work, and that she did not know how she would have been able to help out. *Id*. at 50-52. Although Plaintiff presented evidence that Ms. Giannini, a non-pregnant employee, was allowed to help in the permitting department on two occasions, Defendant has presented uncontroverted evidence that

Ms. Giannini had relevant skills (familiarity with blueprints and prior experience working with computer-aided drafting programs) to help work on plat plans, and that the two occasions on which Ms. Giannini helped in the permitting department were when the person who generally works on blueprints was out. *See* Deposition of Marina Giannini, attached as Ex. W to Deft. Mot. [Doc. 51] (hereinafter "Giannini depo.") at 20-24. Plaintiff has presented no evidence that her supervisor's refusal to allow her to leave the position for which she was hired in order to go "help" in a different department in which she had no experience and no understanding of what work they did was related to her pregnancy.

Finally, Plaintiff points to a conversation that she allegedly had with Ms. Ipiotis about where at the office she would be able to pump breast milk upon her return from pregnancy leave as an example of discrimination. Plaintiff alleges that, when she asked where she could find a private place to pump, Ms. Ipiotis suggested that she use a bathroom stall. Pl. Resp. at 13-14; Doucett depo**.** at 35-38. Although Ms. Ipiotis testified that she did not recall such a conversation and stated that she would have accommodated Plaintiff in any way necessary to make her comfortable, *see* Ipiotis Affidavit at ¶ 26; Ipiotis depo. at 131-134, the Court will assume, for purposes of this motion, that Ms. Ipiotis did suggest that Plaintiff use a bathroom stall to pump. Even assuming this, such an isolated remark does not provide evidence of an intent to discriminate. Although Plaintiff contends that she was understandably upset at the prospect of pumping in the bathroom, she admits that she did not believe that Ms. Ipiotis understood that she would not be comfortable using the bathroom, that she never told Ms. Ipiotis or any HR representative that she was upset by the comment or found it to be discriminatory, that she does not recall how Ms. Ipiotis responded when she said she would be uncomfortable with using the bathroom, and that she decided to put off the issue until after the birth of her baby at which time

23

she could solve the problem with the help of the HR department if necessary.  *See* Doucett depo.

at 35-38, 45.  Ms. Ipiotis's suggestion, on which Plaintiff never followed up, does not

demonstrate discriminatory animus so much as potential insensitivity, and provides no evidence

of a nexus between Plaintiff's pregnancy and the decision to include her among the group that

was laid off in June 2007.

Plaintiff has failed to present sufficient evidence to enable a reasonable factfinder to

conclude that she would not have been selected for layoff had she not been pregnant.  As a

result, Defendant is entitled to summary judgment on the PDA claim.

B.  Plaintiff's FMLA Claim

FMLA retaliation claims are subject to the same *McDonnell Douglas* burden-shifting

framework as claims under the PDA and other Title VII claims.  *See Campbell v. Gambro*

*Healthcare, Inc*., 478 F.3d 1282, 1287 (10th Cir. 2007).   In order to establish a *prima facie* case

of retaliation under the FMLA, Plaintiff must demonstrate that (1) she exercised a protected right

under the FMLA; (2) she suffered an adverse employment action; and (3) a causal connection

exists between the protected activity and the adverse action.  *See Metzler v. Fed. Home Loan*

*Bank of Topeka*, 464 F.3d 1164, 1171 (10th Cir. 2006).  Plaintiff clearly exercised a protected

right under the FMLA when she submitted her first request to take leave upon the birth of her

child and again when she asked about the consequences of reducing her hours or begining leave

early due to complications with her pregnancy.  Plaintiff also plainly suffered an adverse

employment action when she was laid off.  Thus, the only element at issue is whether Plaintiff

can demonstrate a causal connection between her request to take FMLA leave and the layoff.

The Tenth Circuit has "characterized the showing required to satisfy the third prong under a

retaliation theory to be a showing of bad intent or 'retaliatory motive' on the part of the

employer." *Campbell*, 478 F.3d at 1287.  Plaintiff contends that the fact that Ms. Ipiotis (who placed Plaintiff at the bottom of her ranking), Mr. Ferguson (who ultimately selected Plaintiff for layoff), and Defendant's HR department (which signed off on including Plaintiff among those to be laid off) all had knowledge of Plaintiff's leave requests is sufficient to create an issue of fact regarding the existence of a causal connection.

The Court notes that if demonstrating mere knowledge on the part of an employer of protected activity or protected status were sufficient to make a plaintiff's *prima facie* case, a plaintiff's burden at this stage would be almost nonexistent, especially in cases of race or sex discrimination where the plaintiff's protected status is obvious.  The law requires demonstration of a causal connection, not simply knowledge that the plaintiff engaged in a protected activity. Nonetheless, for purposes of this motion, the Court will assume that Plaintiff can make her *prima facie* case.

As discussed in the section on Plaintiff's PDA claim, Defendant has easily met its burden to articulate a facially non-discriminatory reason for Plaintiff's layoff.  Thus, once again, in order to survive summary judgment, Plaintiff must come forward with sufficient evidence to allow a reasonable factfinder to find that Plaintiff's protected activity was a determinative factor in the defendant's employment decision, or that she has shown that the defendant's explanation for its action was merely pretext.  *See EEOC v. Horizon/CMS Healthcare Corp*., 220 F.3d 1184, 1191 (10th Cir. 2000).

Plaintiff's primary evidence of pretext regarding her FMLA claim arises from what she contends was Defendant's refusal to respond to her request to take FMLA leave prior to the birth of her child.  Even viewing the undisputed facts in the light most favorable to Plaintiff, she cannot demonstrate any connection between seeking FMLA leave and her termination.  In

February 2007, several months before the layoff, Plaintiff inquired about taking FMLA leave after the birth of her child.  The local HR coordinator, Amy Nunez, routed the inquiry to corporate HR headquarters.  In response to Plaintiff's inquiry, Sharian Stallworth, who handled FMLA leave at corporate HR, sent an acknowledgment that the birth of Plaintiff's child would be a qualifying event for such leave.  In May 2007, Ms. Stallworth sent Plaintiff an email confirming that she had all of the information she needed from Plaintiff for her FMLA leave request and reminding her that all she needed to do was to inform Ms. Stallworth when she began her leave.  In early June, Plaintiff asked Ms. Nunez whether she might be able to take her leave early or cut back her hours if her medical condition necessitated it, and what such leave would mean for her benefits.  *See* Doucett depo. at 68-71.  Ms. Nunez, who was still going to school in the field of human resources, did not know the answer to Plaintiff's questions and therefore sent Plaintiff's FMLA questions to Ms. Stallworth by email on June 6, 2007.  Ms. Stallworth responded on Saturday, June 9, 2007, indicating that, consistent with Defendant's written FMLA policy, Plaintiff qualified for FMLA leave regardless of whether she cut her hours or not.  In reply to Ms. Stallworth's response, Ms. Nunez emailed the corporate HR department on June 11, 2007 to indicate that she had heard nothing further as to the timing of Plaintiff's leave.  The next day, Plaintiff received notification of her layoff.

Plaintiff contends that Ms. Nunez and Defendant discriminated against her by never getting back to her regarding her questions about taking FMLA leave early, and implies that her question about the effect of taking leave early led to her termination.  *See* Doucett depo. at 70-71.  Although the temporal proximity between her questions and her layoff is close, Plaintiff fails to come forward with any evidence of a causal connection between the two.  Most damaging to Plaintiff's claim is the undisputed fact that Mr. Ferguson submitted a list of

employees selected for layoff (which included Plaintiff) to the corporate HR department on June 5, 2007.  *See* Ferguson Affidavit at ¶ 34; Ex. H to Ferguson Affidavit.[8]  Plaintiff did not meet with Ms. Nunez to ask the questions that she claims caused retaliation until June 6, 2007. Additionally, less than a week passed between the time Plaintiff asked her questions and the layoff.  Ms. Nunez conveyed Plaintiff's questions to Ms. Stallworth via email on the same day that Plaintiff asked the questions.  Ms. Stallworth responded to Ms. Nunez three days later, on a Saturday, and reconfirmed what was already clearly stated in Horton's benefits handbook–that eligibility for FMLA leave is not based on how many hours an employee works, and that FMLA leave can be taken by working a reduced schedule.  Thus, only one business day passed between when Ms. Nunez received the response and when the general layoff occurred.  These facts do not support a claim of discrimination or retaliation.

Finally, Plaintiff points to the layoff of Ms. Nunez upon her return from FMLA leave as evidence of a corporate policy to punish employees for taking leave.  Ms. Nunez gave birth in October 2007, and the took nine weeks of FMLA leave.[9]  *See* Deposition of Amy Nunez, attached as Ex. U to Deft. Mot. [Doc. 51] (hereinafter "Nunez depo.") at 45-46.  Shortly after her return to work, Ms. Nunez was laid off as part of a January 2008 RIF that included 14 other employees.  Mr. Ferguson testified that Ms. Nunez was laid off because the employee level in

---

[8] Although Plaintiff disputes Mr. Ferguson's explanation for the reason that he sent the list of names to corporate HR, she has not disputed the fact that he sent the list on June 5, or that her name was on the list at that time.

[9] Of course, the fact that Ms. Nunez was not part of either the June 2007 layoff or the September 2007 layoff despite being pregnant further contradicts Plaintiff's speculative claim that Defendant had a pattern of choosing pregnant employees for layoff.  Similarly, the fact that Defendant laid off Ms. Nunez *after* she returned from FMLA leave directly contradicts Plaintiff's other speculative argument that Defendant laid off Plaintiff *before* she took FMLA leave in an attempt to save money.

the New Mexico division had dropped so much that her position as the local HR coordinator was no longer needed.  *See* Ferguson affidavit at ¶ 45; Ferguson depo. at 153-154.  Ms. Nunez also testified that she believes that her layoff was due to a general reduction in force and the fact that her position was no longer necessary, and that neither her layoff nor that of Plaintiff had to do with their pregnancies or their decision to use FMLA leave.  *See* Nunez depo. at 45-46, 52.  As with her own case, Plaintiff has failed to come forward with any evidence to indicate that Ms. Nunez's pregnancy or her use of FMLA leave were determining factors in her layoff, or that Ms. Nunez's layoff was pursuant to a corporate policy of discrimination.

While an employer may not discriminate against a worker for exercising her rights under the FMLA, by the same token, "an employee who requests FMLA leave [has] no greater protection against his or her employment being terminated for reasons not related to his or her FMLA request than he or she did before submitting the request."  *Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1262 (10th Cir. 1998).  Plaintiff has come forward with no evidence that the reasons given for her layoff were a pretext for discrimination or that she would have been retained had she not been pregnant or requested FMLA leave.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Defendant's *Motion for Summary Judgment No.1* [Doc. 51] is **GRANTED** and *Motion for Summary Judgment No. 2* [Doc. 52] is declared moot.


_____
**UNITED STATES DISTRICT JUDGE**